ROBERT L. SHAVER v. N. C. MONROE CONSTRUCTION COMPANY AND N. CARL MONROE, INDIVIDUALLY

No. 8218SC810

(Filed 6 September 1983)

1. **Pensions § 1— fraudulent misrepresentation as to pension plan—jurisdiction of State courts**

    The courts of this State had jurisdiction of plaintiff's action against his former employer for fraudulent misrepresentation that a company pension plan was still in effect for the purpose of inducing plaintiff to remain with the employer and to forego salary increases and bonuses since (1) the Employee Retirement Income Security Act of 1974 did not give the federal courts exclusive jurisdiction over such claim because plaintiff's claim did not concern the substance or regulation of the pension plan and the pension plan was only incidentally or tangentially involved, and (2) defendant employer's pension plan terminated prior to the effective date of the Employee Retirement Income Security Act and was thus not governed by the Act.

2. **Fraud § 12; Pensions § 1— fraudulent misrepresentation concerning pension plan—sufficiency of evidence**

    Plaintiff's evidence was sufficient for the jury in an action against his former employer for fraudulent misrepresentation that a company pension plan was in effect and still being funded for the purpose of inducing plaintiff to remain with the employer and to forego salary increases and bonuses.

3. **Fraud § 13; Pensions § 1— misrepresentation concerning pension plan—instructions—silence as actionable fraud**

    In an action by plaintiff against his former employer for fraudulent misrepresentation that a company pension plan was in effect and still being funded, the trial court did not err in instructing the jury that silence could constitute actionable fraud where there was evidence that the employer wrote a letter to plaintiff and other salaried employees which stated that the costliness of the pension plan necessitated a cutback in salaries and bonuses and implied that contributions were still being made to the plan, and that when plaintiff inquired about the plan, he was told it was in effect or "intact," since the employer, although under no legal duty to speak about contributions to the plan, was required to make a full and fair disclosure as to the matters about which it spoke.

4. **Fraud § 13; Pensions § 1— fraudulent misrepresentation about pension plan—measure of damages—instructions**

    In plaintiff's action against his former employer for fraudulent misrepresentation that a company pension plan was still in effect for the purpose of inducing plaintiff to remain with the employer and to forego salary increases and bonuses, the proper measure of damages was the difference between the amount which would have been distributed to plaintiff had continuous contributions been made to the plan and the amount which was actually distributed to him, and the trial court erred in instructing the jury that it

could choose as an alternate measure of damages the difference in value be-
tween plaintiff's services during the time he worked under the fraudulent in-
ducement and the price he was actually paid for his services because of the
deceit.

5. **Fraud § 13; Pensions § 1— fraudulent misrepresentation concerning pension
plan—punitive damages**

There was sufficient evidence of fraud and of other elements of aggrava-
tion in an action to recover damages for misrepresentation that a company
pension plan was still in effect to support the submission of an issue of
punitive damages to the jury.

APPEAL by defendants from *Helms, Judge.* Judgment
entered 7 April 1982 in Superior Court, GUILFORD County. Heard
in the Court of Appeals 18 May 1983.

*Brooks, Pierce, McLendon, Humphrey & Leonard, by Hubert
B. Humphrey, Michael D. Meeker, and Howard L. Williams, for
defendant appellants.*

*Smith, Moore, Smith, Schell & Hunter, by McNeill Smith and
Ben F. Tennille, for plaintiff appellee.*

BECTON, Judge.

Plaintiff instituted this action against his former employer
alleging causes of action for fraudulent misrepresentation, breach
of fiduciary duty, breach of contract, violation of the Employee
Retirement Income Security Act of 1974 (ERISA), and breach of
duty of good faith dealing. The chief allegation is that defendants
misrepresented to plaintiff that a company pension plan was still
in effect for the purpose of inducing plaintiff to remain with
defendants and to forego salary increases and bonuses. Plaintiff
sought compensatory and punitive damages.

I

After plaintiff took a voluntary dismissal of his claim alleging
ERISA violations, defendants moved to dismiss the complaint on
the ground of lack of subject matter jurisdiction, and contended
that ERISA removed any employee pension and benefit programs
from state regulation and granted exclusive jurisdiction to federal
courts. Defendants' appeal to this Court from the denial of that
motion was dismissed as interlocutory. *Shaver v. Construction
Co.,* 54 N.C. App. 486, 283 S.E. 2d 526 (1981).

Shaver v. Monroe Construction Co.

The matter was then tried before a jury. At the close of plaintiff's evidence, defendants moved for directed verdict on all issues. The trial court allowed the motion as to the breach of fiduciary duty and the breach of fair dealing claims. The case was submitted to the jury on the fraudulent misrepresentation and breach of contract claims.

The jury found that defendants did, after 30 December 1974, fraudulently misrepresent to plaintiff that the company pension plan was still in effect, was being funded, and had not terminated. It awarded plaintiff $40,000 in compensatory damages and $40,000 in punitive damages as a result of this fraudulent misrepresentation. It also found that defendant N. C. Monroe Construction Company did not breach its employment contract with plaintiff.

The court denied defendants' motion for judgment notwithstanding the verdict and entered judgment on the verdict. Defendants appeal.

## II

The issues on appeal concern subject matter jurisdiction, the sufficiency of the evidence, the submission of instructions to the jury on silence as actionable fraud, the proper measure of compensatory damages, and the propriety of submitting to the jury an issue on punitive damages.

## III

[1] The first issue is whether the courts of North Carolina have jurisdiction over plaintiff's claims. Answering this issue requires an examination of ERISA.

ERISA was enacted by Congress to foster interstate commerce and to protect the interests of participants in employee benefit plans by requiring the disclosure and reporting of financial and other information to participants and their beneficiaries, by establishing standards for fiduciaries, and by providing appropriate remedies, sanctions, and ready access to federal courts. 29 U.S.C. § 1001(b). "It is hereby further declared to be the policy of [ERISA] to protect . . . the Federal taxing power, and the interests of participants in private pension plans and their beneficiaries" by providing adequate safeguards to assure the equitable character and financial soundness of such plans. 29 U.S.C. § 1001(c).

To eliminate the threat posed by conflicting or inconsistent State or local regulation of employee benefit plans, *see* 120 Cong. Rec. 29933; 120 Cong. Rec. 29197, Congress enacted a pre-emption clause, codified at 29 U.S.C. § 1144(a), which provides:

> (a) Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

Congress also granted exclusive jurisdiction to the federal courts over all actions arising under the subchapter of ERISA dealing with the protection of employee benefit rights. 29 U.S.C. § 1132(e)(1). It, however, granted concurrent jurisdiction to the states over actions brought by a participant or beneficiary to recover benefits due him or her under the terms of that plan, or to enforce or clarify his or her rights under the terms of that plan. 29 U.S.C. § 1132(e)(1); 29 U.S.C. § 1132(a)(1)(B).

Defendants thus contend that all state law claims or causes of action relating to a pension plan are superseded or pre-empted by § 1144(a) of ERISA, and that all legal actions should be brought under ERISA in federal district court, with the exception of actions brought to recover benefits when not paid or to clarify one's rights to benefits under the plan.

Upon first blush, defendants' argument appears meritorious. However, upon a closer analysis of ERISA and the nature of plaintiff's cause of action, defendants' argument is unpersuasive.

Section 1144(a) specifically provides that the provisions of the subchapter dealing with the protection of employee benefit rights "shall supersede any and all State laws *insofar as they may now or hereafter relate to any employee benefit plan.*" (Emphasis added.) Thus, the question confronting us is whether plaintiff's state law claim for fraudulent misrepresentation *relates to* the pension plan.

This is apparently a question of first impression in North Carolina. Courts in other jurisdictions which have dealt with the question have uniformly held that a state law which directly regu-

lates the content or operation of an ERISA plan is pre-empted by section 1144(a). *Provience v. Valley Clerks Trust Fund,* 509 F. Supp. 388 (E.D. Cal. 1981). The decisions have not been consistent, however, when the state law tangentially impacts upon an ERISA plan, as opposed to directly regulating it, as the following discussion shows.

In *Provience,* plaintiff alleged that defendant Trust Fund and its officers and agents (1) fraudulently misrepresented the nature of benefits available under their medical plan; (2) refused in bad faith to pay a legitimate claim for medical benefits; and (3) intentionally inflicted emotional distress on plaintiff. The court held that these state law claims were not pre-empted by ERISA because they were laws of general application pertaining to an area of important state interest and only indirectly affected, rather than directly regulated, the ERISA plan involved.

In *Cornell Mfg. Co. v. Mushlin,* 420 N.Y.S. 2d 231 (N.Y. App. Div. 1979), plaintiff brought an action against corporate officials to recover damages for self-dealing and waste of corporate assets alleging that defendants made excessive contributions into a pension fund over which defendants had exclusive control and from which they received inordinate benefits. Rejecting defendants' contention that ERISA pre-empted the claim pertaining to excessive payments to the pension fund, the court noted that the pension plan was only incidentally involved in plaintiff's claim; thus, the claim was not so limited to the pension plan as to require pre-emption under ERISA. The court also cited four factors, based upon its research, which appeared to influence the determination of the pre-emption issue:

> (1) the extent to which the law in question relates to an area traditionally within the State's domain . . . (2) the extent to which the purpose or effect of the law impinges upon employee benefit plans . . . (3) the extent to which the relief sought or procedures employed are incompatible with those of ERISA . . . and (4) the extent to which the rights sought to be enforced by the aggrieved party actually arise under an employee benefit plan . . . . (Citations omitted.)

420 N.Y.S. 2d at 236.

In *Shaw v. Westinghouse Electric Corp.,* 419 A. 2d 175 (Pa. Super Ct. 1980), plaintiff brought an assumpsit action against his

employer for disability and retirement benefits. Plaintiff alleged that one of the terms of his contract of employment with defendant was that plaintiff would receive a pension based upon 60% of his base salary. He alleged that defendant did not pay him promised salary increases, thus causing him to lose bonuses and pension benefits. Defendant moved to dismiss for lack of subject matter jurisdiction. The court held that the action was not preempted by ERISA. The action did not constitute an attempt to regulate areas explicitly governed by the provisions of ERISA, but, rather, related primarily to matters not governed by ERISA, and only indirectly affected defendant's employee benefit plan in a way not in conflict with purposes ERISA was designed to achieve.

In the case before us, the gist of plaintiff's fraudulent misrepresentation claim is that defendants lied about the continued existence of a pension plan for the purpose of inducing plaintiff to remain with defendants and to forego bonuses and salary increases. Plaintiff's claim does not concern the substance of the plan, nor does it concern the regulation of a pension plan. The pension plan is only incidentally or tangentially involved. Because plaintiff's claim is not covered by ERISA, the federal courts do not have jurisdiction. *Fulk v. Bagley*, 88 F.R.D. 153 (M.D.N.C. 1980); *Martin v. Bankers Trust Co.*, 565 F. 2d 1276 (4th Cir. 1977).

Moreover, even if plaintiff's claims were otherwise within the ambit of ERISA, defendants would nevertheless lose their subject matter jurisdiction argument. Defendants admitted in their answer that the pension plan terminated on 31 December 1974, which was prior to the effective date of ERISA, 1 January 1975. They also admitted in their answer that one of the reasons that they terminated the plan at that time was in order to avoid complying with ERISA. In addition, the U.S. Department of Labor wrote plaintiff a letter stating that since the plan terminated effective 31 December 1974, it did not have the authority to intervene on plaintiff's behalf since ERISA is not retroactive. An interpretation of a statute by an agency with expertise in administering it is entitled to due consideration by the courts. *In re Broad and Gales Creek Community Association*, 300 N.C. 267, 266 S.E. 2d 645 (1980).

We thus conclude that ERISA does not govern this case and that the State court retains jurisdiction. The motion to dismiss for lack of subject matter jurisdiction was, therefore, properly denied.

## IV

[2] Defendants next assign error to the denial of their motions for directed verdict and for judgment notwithstanding the verdict on the fraud issue.

The rules of law governing the determination of the motions are familiar. The motions present the question whether the evidence, taken in the light most favorable to the non-movant plaintiff, constituted "any evidence more than a scintilla" to support the plaintiff's *prima facie* case in all its constituent elements. *Shreve v. Combs*, 54 N.C. App. 18, 21, 282 S.E. 2d 568, 571 (1981). Contradictions, conflicts and inconsistencies which appear in the evidence must be resolved in the non-movant's favor and the non-movant must be given the benefit of every inference which can reasonably be drawn. *Sumney v. Cauthen*, 283 N.C. 640, 197 S.E. 2d 549 (1973).

To have a *prima facie* case of actual fraud, there must be evidence tending to show: (1) a false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) which was relied upon by, and which resulted in damages to, the injured party. *Terry v. Terry*, 302 N.C. 77, 83, 273 S.E. 2d 674, 677 (1981). *See also, Johnson v. Phoenix Mut. Life Ins. Co.*, 300 N.C. 247, 266 S.E. 2d 610 (1980).

Mindful of these principles, we find the following evidence, taken in the light most favorable to plaintiff, sufficient to withstand the motions.

Plaintiff was employed continuously as a construction superintendent by defendant N. C. Monroe Construction Company (Company) from 1959 until he was fired in March 1979. In 1970, the Company adopted a pension plan, which covered salaried employees such as plaintiff, and which contained provisions allowing the Company to discontinue making contributions, amend the plan, or terminate the plan at any time.

Contributions were made to the plan by the Company solely in 1970, 1971, 1972 and 1973. No contributions to the plan were made after the 1973 plan year. On December 31, 1974, the plan was terminated—defendants admitted that in their answer; Monroe, who was the President and owner of the company, stated that in a deposition; and the Company represented that to the Internal Revenue Service. No employees hired after 31 December 1974 participated in the plan. On 30 July 1979, after this action was instituted, Monroe wrote a letter to his employees in which he stated, "As you know, the pension plan was terminated in 1974 as a result of the construction recession and its effect upon the ability of the Company to continue contributing to the pension plan."

Despite this evidence that the plan had been terminated in 1974, and that defendants knew of this termination, when plaintiff asked Monroe, on several occasions after 1 January 1975, about the company's fringe benefits, so he could relay the information to new employees, Monroe told him that the benefits, including the pension plan, were still in effect. Plaintiff recited two specific occasions, in 1976 and 1978, in which he specifically inquired whether the retirement plan was still in effect and Monroe told him it was. Monroe's version of the incidents was that he told plaintiff that the plans were "intact." Whether plaintiff's interpretation of Monroe's statement was reasonable was for the jury, as was the resolution of conflicts in their stories.

There was also evidence tending to show that the representations were calculated, and made with the intent, to deceive. There was evidence that a pension plan was favorable to older employees and was used to attract experienced employees. In the early 1970's, Monroe Construction Company hired a number of older and more experienced employees. When the plan was instituted, Monroe informed plaintiff and the other employees about the pension plan and how it would help with their retirement. Monroe also told them that they would not be receiving the same bonuses or salary increases as before due to the cost of the pension plan.

Around Christmas 1974, Monroe wrote the following letter to the employees:

Shaver v. Monroe Construction Co.

Through the years, various customs have evolved within our company including company paid fringe benefits. For a very long time, the company has paid hospital benefits for the entire family plus a discretionary year end bonus. Some few years ago we adopted a company paid pension plan, which represents a much greater cost than the year end bonus. This was done with the intent of eliminating or greatly reducing any bonus. However, we did continue to pay a bonus plus the pension plan.

Based on the severe economic situation, its effect on our industry and our firm, it would be neither prudent nor possible for management to grant a bonus at this time.

From this letter the jury could have inferred that an implied representation was made that contributions were being made that year. As the Christmas letter indicates, the pension plan was costly. The company contributions to the plan over the first four years totaled $83,734.00. The projected contributions were to exceed $83,000.00 for the years 1974 and 1975.

From 1974 through 1977, a period through which no contributions were being made to the plan, plaintiff's salary remained at $16,600.00. He also received no bonuses during this period. Prior to 1971, plaintiff had been receiving an annual bonus of $3,000.00. Interestingly, plaintiff and the other employees received a salary increase shortly before notice of termination of the plan was given to the employees in 1978.

Plaintiff was 52 or 53 years old when the plan was first instituted and was becoming increasingly concerned about his retirement income. He had told Monroe that the pension plan was important to him personally because of his age and financial condition. The pension plan was a governing factor in his remaining with the Company. In fact, he turned down other jobs to remain with the Company because he did not want to lose the pension plan.

From the foregoing evidence, the jury could infer that plaintiff and the other employees were led to believe that contributions were still being made to the pension plan and that it was still in effect in order to induce them to forego pay increases and bonuses and to remain with the Company, while saving the Com-

pany money. There was sufficient evidence from which the jury could conclude that the statements were false, were reasonably calculated, and made with the intent to deceive the plaintiff, and that plaintiff was deceived and suffered damages as a result.

V

[3] Defendants next assign error to the trial court's instruction to the jury that silence could constitute actionable fraud. They argue that the instruction was improperly given because they were under no legal duty to disclose that contributions were not being made.

> Silence, in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the other contracting party, whether the duty arises from a relation of trust, from confidence, inequality of condition and knowledge or other attendant circumstances. . . .

*Setzer v. Insurance Co.,* 257 N.C. 396, 399, 126 S.E. 2d 135, 137 (1962).

Although there was no fiduciary relationship in the case before us, there were "other attendant circumstances" to justify the instruction to the jury. Defendants were under no duty to speak, but once the Company spoke, it was required to make a full and fair disclosure as to the matters discussed. *See Ragsdale v. Kennedy,* 286 N.C. 130, 209 S.E. 2d 494 (1974).

Here, Monroe, in the Christmas letter of 1974, told plaintiff and other salaried employees that the costliness of the pension plan necessitated a cutback on salaries and bonuses and impliedly represented that contributions were being made to the plan that year. Further, a pension plan consultant testified that any information about contributions had to be obtained from the plan administrator. When plaintiff questioned his office after learning about the termination of the plan, the pension plan consultant referred him to Mr. Monroe, who was the plan administrator and plaintiff's only source of information.

When plaintiff inquired in 1976 and early 1978 about the status of the pension plan, he was told it was still in effect or "intact." Upon receiving that answer, plaintiff reasonably assumed

that contributions were continuously being made to the plan. It could not reasonably be expected of plaintiff to inquire further as to whether contributions were being made.

We hold that, under the circumstances of this case, the trial court did not err in submitting the instruction to the jury. There was sufficient evidence to support the submission of the instruction.

## VI

[4] Defendants next assign error to the trial court's instructions on the measure of damages. The court instructed the jury that it could choose from one of two measures of damages, but not both or a combination of both. The first of these measures was the difference in the value of plaintiff's services during the time that he worked under the fraudulent inducement and the price he was actually paid for his services because of the deceit. The second measure of damages was the benefit of the bargain, which is the difference between the amount that would have been distributed to plaintiff had continuous contributions been made to the plan and the amount which was actually distributed to him. Defendants contend that the first measure was erroneously submitted to the jury. We agree.

The underlying principle in fixing damages is to compensate the injured party. E. Hightower, *North Carolina Law of Damages*, § 2-1 (1981). The objective of any proceeding to rectify a wrongful injury resulting in loss is to restore the victim to his original condition, and give him back that which was lost, so far as possible by compensation in money. *Phillips v. Chesson*, 231 N.C. 566, 571, 58 S.E. 2d 343, 347 (1950). The goal is to make the plaintiff whole.

The evidence is clear that the pension plan was important to plaintiff. He was willing to forego salary increases and bonuses and remain with the Company as long as the plan was being maintained and continuously funded. He elected to remain with the Company at a salary less than the salary that he could have commanded elsewhere. He did not lose a job at another company as the result of defendant's fraudulent misrepresentations. Indeed, he even remained with the Company after he learned of the termination of the plan in May or June 1978 until he was fired in March 1979. What plaintiff lost as a result of the misrepresenta-

tions was the amount of the contributions which supposedly were being made. To allow plaintiff to recover the difference between the value of his services and his salary at the Company would be to allow him a windfall and would be contrary to the underlying principles of compensatory damages.

The proper measure of damages in this case is the benefit of the bargain, which puts the plaintiff in the same position he would have been had the representation been true. This method allows him to recover the difference between the actual value of the subject of the representation and the value as represented, and has generally been applied in fraud cases. *Norburn v. Mackie,* 264 N.C. 479, 141 S.E. 2d 877 (1965). Under this measure, plaintiff will recover what he lost—the contributions which were not made.

We therefore hold that the court erred in submitting the first measure of damages to the jury. Since there was evidence that the maximum amount plaintiff could have received if the contributions had continued until June 1978 was $16,309.85 and that plaintiff's salary was approximately $20,000 while the value of his services was approximately $30,000, the jury's award of $40,000 was clearly based upon the first measure of damages. For this reason, this cause must be remanded for a new trial on the issue of damages.

## VII

[5] Defendants lastly contend that the trial court erred in submitting the issue of punitive damages to the jury because there was insufficient evidence of fraud to support its submission.

As defendants concede, punitive damages may be recovered as a matter of law in fraud cases, because fraud, by its very nature, involves the element of aggravation or intentional wrongdoing. *Newton v. Standard Fire Insurance Co.,* 291 N.C. 105, 229 S.E. 2d 297 (1976). Punitive damages are allowed to punish intentional wrongdoing and to deter similar behavior. *Oestreicher v. American National Stores, Inc.,* 290 N.C. 118, 225 S.E. 2d 797 (1976).

As we stated earlier, all of the elements of fraud are present in this case. In addition, there is evidence of other "elements of aggravation." Other employees besides plaintiff were similarly af-

Shaver v. Monroe Construction Co.

fected by the fraud. Defendant could not afford to make the contributions to the plan (which would have amounted to approximately $83,000.00), yet there was evidence that a partnership in which Mr. Monroe had an interest owed the Company more than $100,000.00. The punitive damage issue was thus properly submitted to, and answered by, the jury. Although we have determined that the evidence is sufficient to support the jury's verdict that plaintiff is entitled to punitive damages, the amount of punitive damages must be determined by a jury at the new trial. As we said in *Carawan v. Tate*, 53 N.C. App. 161, 167, 280 S.E. 2d 528, 532 (1981), *aff'd*, 304 N.C. 696, 286 S.E. 2d 99 (1982), "there is a substantial likelihood that the two issues [compensatory and punitive damages] were so intertwined in the minds of the jurors that it would result in an injustice to remand this case for a new trial on one issue only."

For the foregoing reasons, defendant is entitled to a new trial relating solely to damages.

New trial.

Chief Judge VAUGHN and Judge HILL concur.